UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| MARISA BUSSA,<br><br>               Plaintiff,<br><br>   v.<br><br>PIERCE COUNTY, PIERCE COUNTY SHERIFF'S DEPARTMENT; MICHA LUNDBORG; THERON HARDESTY; ANDREA PICCOLO,<br><br>               Defendant. | CASE NO. C09-5634BHS<br><br>ORDER GRANTING IN PART MOVING DEFENDANTS' MOTION AND REMANDING STATE LAW CLAIMS |

This matter comes before the Court on the Moving Defendants' motion for summary judmgent (Dkt. 11).[1] The Court has considered the pleadings filed in support of and in opposition to the motion and the remainder of the file and hereby grants the motion in part and remands the matter as to the remaining state law claims for the reasons discussed herein.

**I. PROCEDURAL HISTORY**

On October 8, 2009, the Moving Defendants removed this matter from state court in Pierce County. Dkt. 1. On January 18, 2010, Plaintiff ("Bussa") amended her complaint (adding Theron Hardesty and Piccolo). Dkt. 7.

---

[1] The Moving Defendants include Pierce County, Pierce County Sheriff's Department, Micha Lundborg, and Theron Hardesty. Andrea Piccolo ("Piccolo"), a private citizen, did not join in the motion.

ORDER - 1

On October 28, 2010, the Moving Defendants filed their motion for summary judgment as to all claims. Dkt. 11. On November 11, 2010, Bussa responded in opposition. Dkt. 16. On November 19, 2010, the Moving Defendants replied. Dkt. 17.[2]

## II. FACTUAL BACKGROUND

In the early hours of September 26, 2008, Piccolo and Bussa were spending time at the Tipperary Tavern, each consuming four alcoholic beverages. Deposition of Marisa Bussa (Bussa Dep.), at 14:4-7; *id.* at 13:21-25. Upon leaving the tavern, the two women went to Denny's restaurant. Bussa Dep., at 14:8-12.

Bussa and Piccolo left Denny's, got into a white Honda belonging to a third person.[3] Bussa Dep., at 31:15-23. Piccolo drove the Honda while Bussa sat in the front passenger seat.

Piccolo decided to attempt "360s" while driving down what Bussa described as the "main drag." *See* Bussa Dep., at 15:13-16. Officer Theron Hardesty ("Hardesty") spotted the Honda attempting these maneuvers around 2:52 a.m. Hardesty Declaration (Hardesty Decl.), at 2:1-2. Hardesty is a ten-year veteran with the Pierce County Sheriff's Office. He is a canine ("K-9") handler. His canine partner is Cliff. Hardesty and Cliff ride in the patrol car together. In April 2006, Hardesty completed K-9 handler certification, which requires 400 hours of training. Hardesty Decl., at 1:23-25; *see also* WAC 139-05-915 (certification standards). Cliff was certified at the same time. Hardesty Dep., at 15:18-16:16. According to Hardesty, he watched the white Honda reach a high rate of speed,

---

[2] Additionally, both parties moved to strike certain documents, arguments, or otherwise within their respective response and reply to the summary judgment motion at issue. However, because the Court did not rely on the subject matter of those as they might pertain to the grant of summary judgment herein, the Court declines to entertain those motions to strike.

[3] No facts suggest that Bussa and Piccolo were without permission to use the white Honda.

ORDER - 2

decelerate drastically, and then spin 180 degrees in the middle of the road. Hardesty decided to follow the Honda.

Piccolo then drove the Honda into a residential area. Hardesty activated his police lights and siren. Bussa reacted to the situation by tilting her head downward and covering her face. Bussa Dep., at 19:13-22. The Honda swerved dangerously at speeds of 65 mph in a posted 30-mph zone. The Honda's windows were fogged up, and the only occupant that Hardesty could determine was in the vehicle was Piccolo, the driver. Hardesty Dep., at 30:5-9.

Hardesty asked dispatch for backup and informed of his high-speed pursuit of the white Honda. *See* Hardesty Decl., at 2:3. Hardesty informed dispatch that their location was 9th and Polk Street. Hardesty Decl., at 2:4; *see also* Deposition of Charles Roberts, at 7:8-15.

On this night Gene Dowling ("Dowling") resided in his home situated on the intersection of 9th and Polk Street. Dowling Deposition ("Dowling Dep."), at 20:4-6. Piccolo lost control of the vehicle, which went into a four-wheeled skid, crashed through a fence surrounding Dowling's house, and collided with a tree in the middle of his yard. Hardesty Dep., at 34:23-35:3. Were it not for the tree, the Honda may have collided with Dowling's house. *See* Bussa Decl., at 31:15-23, Ex. 1; Deposition of Officer Micha Lundborg ("Lundbord Dep."), at 11:21-25; Hardesty Dep., at 37:22-25. The crash woke Dowling, who came to the window to watch the events unfold.

The entire car pursuit lasted approximately a minute and a half from start to finish. Hardesty Dep., at 34:11-15. Hardesty stopped his patrol car and attempted to look through the fogged-up windows of the Honda for his own safety before approaching the suspect vehicle. Hardesty Dep., at 39:12-17. It is undisputed that, at this point, Hardesty knew only of the driver's (i.e., Piccolo's) presence in the Honda, and it is undisputed that he was unaware, at this point, of Bussa's presence in the Honda.

ORDER - 3

Hardesty was 10 to 14 feet away from the Honda when he initially approached the Honda with his firearm and flashlight drawn. *See* Hardesty Dep., at 45:4-6. However, before he could get closer to the Honda, Piccolo exited the vehicle and began to flee from the scene on foot. *See, e.g.,* Hardesty Dep., at 45:4-6.

Hardesty, believing that he could not catch Piccolo on foot, attempted to activate his patrol vehicle door to release his K-9, Cliff, to pursue Piccolo. Hardesty Dep., at 48:21-49:2, 53:4. However, Hardesty's remote control malfunctioned, and he had to return to his vehicle to release the door and put Cliff on track for apprehending Piccolo. Hardesty Dep., at 50:70-20. Hardesty pointed at Piccolo and gave Cliff the apprehension command. Hardesty Dep., at 54:19-55:9.

Cliff began to track Piccolo but then followed the scent back to the Honda, where Piccolo had left the door ajar. Hardesty Dep., at 55:20 – 56:1; *see also* Dowling Dep., at 15:2-5. Cliff entered the Honda and bit Bussa on or near her left knee. This was the first moment Hardesty learned that someone other than Piccolo had been in the Honda during the pursuit. Hardesty gained control of Cliff, commanded him to release Bussa, and removed him from the vehicle. Hardesty Dep., at 64:22-65:2. Meanwhile Bussa was poking Cliff in the face, which irritated Cliff. *See* Bussa Dep., at 21:24-25.

Around 2:55 a.m., Hardesty called for medical aid for Bussa. At the same time, Lundborg arrived on the scene.[4] Hardesty Dep., at 62:4-5. Hardesty explained most of the situation to Lundborg and asked him to get Bussa out of the Honda. Hardesty did not have time to mention the dog bite, as he needed to return to pursuing Piccolo. *See, e.g.,* Lundborg Dep., at 13:3-5.

---

[4]Lundborg is a 16-year veteran deputy sheriff with the Pierce County Sheriff's Office. Lundborg also has a K-9 partner, Vasko. Vasko remained in Lundborg's vehicle during all relevant times.

ORDER - 4

Lundborg drew his weapon and proceeded to approach the Honda in an effort to get Bussa out of the Honda and clear the area for officer safety. *See* Lundborg Dep., at 15:5-7, 17:8-12. Lundborg believed that, given Piccolo's flight after a high-speed pursuit, the incident was considered a high-risk stop that called for the use of his firearm. *See* Lundborg Dep., at 15:5-6, 17:8-12. At the time, it was unknown if Bussa was armed or whether there were weapons within the Honda for which she may have access. Hardesty Decl., at 2:21-24.

Lundborg ordered Bussa to show her hands, get out of the vehicle, and get onto the ground. Lundborg Dep., at 15:1-4. He ordered her out of the car at gunpoint. Lundborg Dep., at 15:7-8. Lundborg testified as follows regarding the incident:

> Because I know Theron needed to start his track for the driver. And as far as I could tell, this is like any other kind of a chase, where she was going to be a threat until otherwise known. She was a risk to my safety, Theron's safety, and anybody else in there. So until we had proven otherwise, there is a risk. And like I said, if I'm there with two guns, she's got access to two guns. So she's detained, she's safe, then we're safe.

Lundborg Dep., at 22:10-19.

Bussa did not immediately comply, despite Lundborg's repeated orders. *See* Bussa Dep., at 26:11-12. In fact, Lundborg had to order Bussa out of the car several times before she complied. Lundborg later learned that Bussa was calling 911 on her cell to get attention for her knee and other perceived injuries. Lundborg Dep., at 22:24-25; *see also* Bussa Dep., at 27:7-9, 42:17-18 (describing that she believed her neck and back to be broken, which she later found out was not the case). Bussa eventually exited the car, got on the ground, and was handcuffed. Bussa Dep., at 27:17, 30:24; *see also* Lundborg Dep., at 24:24-25:8. (claiming officer safety in his deposition when asked why he had handcuffed Bussa).

Lundborg helped Bussa up off the ground and escorted her to his police car where she sat on its push bar. *See* Bussa Dep., at 31-6-13; Dowling Dep., at 10:7, 10:17-23; Lundborg Dep., at 25:22-24.

At this point, Hardesty, who had been restraining Cliff due to being agitated by Bussa's poking, released Cliff to resume tracking Piccolo.

After questioning Bussa regarding her involvement with Piccolo and the incident, Bussa was released from handcuffs and detention; at that point, the medics who had arrived around 2:59 a.m., took medical control of Bussa by 3:01 a.m. *See* Declaration of Brian Ferrier ("Ferrier Decl."), at 2:12-13. At 3:30 a.m., Bussa was taken by medics and without police accompaniment to the hospital. Ferrier Decl., at 2:20-22-23. Bussa was medically released about six hours after her arrival at the hospital with no further investigation by the police at that time. Bussa Dep., at 37:13-16; 42:17-18.

Cliff tracked Piccolo to Bussa's residence, which was around the corner from Dowlings home, but Piccolo was not inside. Hardesty Dep., at 70:19-71:4. Hardesty called off the search. Hardesty Dep., at 73:4-22. Piccolo was later apprehended and is now serving 22 months in prison for her involvement in this incident. *See State of Washington v. Andrea Piccolo*, 08-1-05732-3 (Pierce County Superior Court).

Based on the foregoing, Bussa filed her complaint against the Moving Defendants alleging that Hardesty and Lundborg violated her 28 U.S.C. § 1983 civil rights by infringing on her right to be free from unlawful seizure under the Fourth Amendment. Dkt. 7 (Amended Complaint). The Moving Defendants move for summary judgment on all causes of action brought against them. Dkt. 11.

### III. DISCUSSION

**A.     Summary Judgment Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material

ORDER - 6

fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson,* 477 U.S. at 255). Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

ORDER - 7

**B.     Moving Defendants' Motion for Summary Judgment**

    **1.     Unlawful Seizure, Fourth Amendment**

The Fourth Amendment to the United States Constitution protects an individual's right to be free from *unlawful* seizure. *United States v. Al Nasser*, 555 F.3d 722, 725 (9th Cir. 2009). In order to establish an unlawful seizure within the meaning of the Fourth Amendment, a person must first establish that a seizure occurred. *See, e.g., Tennessee v. Garner*, 471 U.S. 1, 7 (1985).

    **a.     Initial Pursuit**

When a suspect does not yield to a police's show of authority (i.e., turn on their lights and siren), no seizure has occurred for purposes of the Fourth Amendment. *California v. Hodari D.*, 499 U.S. 621, 629 (1991) (no seizure had occurred when defendant discarded his cocaine because he was fleeing from the police at the time). Similarly here, Hardesty could not have siezed the Honda or its occupants when he activated his patrol lights and siren because Piccolo did not yield and, instead, engaged Hardesty in a pursuit.

Therefore, the Court grants summary judgment in favor of the Moving Defendants on this issue.

    **b.     Dog Bite**

In order for seizure to occur under the Fourth Amendment, "an intentional acquisition of physical control" must exist over the person claiming seizure. *Brower v. County of Inyo*, 489 U.S. 593, 597 (1989). The Ninth Circuit has held that "[a] person is seized when he is 'meant to be stopped by [a particular law enforcement action] . . . and [is] so stopped.'" *Al Nasser*, 555 at 731 (brackets in original) (no seizure when occupant chose to stop his own car, even though officers had decided not to stop defendant's car). In *Al Nasser*, the Court held that "[s]ince there was no intentional governmental action directed at Al Nasser to bring about the stop of his vehicle, there could be no Fourth

ORDER - 8

Amendment 'seizure.'" 555 F.3d at 731. Such a situation is referred to as an "accidental effect[] of otherwise lawful government conduct." *Id*. at 732 (citing *Brower*, 489 at 596-97.

Here, Hardesty gave Cliff the command to apprehend Piccolo. Before Cliff bit Bussa, Hardesty was unaware of Bussa's presence in the Honda. This fact is uncontroverted and conceded by Bussa. This fact is fatal to Bussa's claim of seizure by dog bite, let alone unlawful seizure under the Fourth Amendment. Indeed, being unaware of Bussa's presence makes it factually impossible for Hardesty to have intended for Cliff to contact Bussa in particular. Additionally, it is uncontroverted that Hardesty commanded Cliff to track Piccolo, a suspect who had fled the scene, and not Bussa, which also makes it factually impossible that Cliff was sent to track Bussa in general, as a suspect fleeing the scene. Stated differently, Bussa's dog bite was the "accidental effect[] of otherwise lawful government conduct." *See* Brower*,* 489 U.S. at 596-97.

Therefore, the Court grants summary judgment in favor of the Moving Defendants on this issue.

### c. Second Gun

It was Bussa's testimony that she could not recall more than one gun in her face or whether it was Hardesty or Lundborg who had put a gun in her face. Hardesty testified that he did not put a gun in Bussa's face; consistent with this is that Lundborg testified he did order Bussa out of the car at gunpoint. Thus, given the facts, Bussa's claim of unlawful seizure within the meaning of the Fourth Amendment is based on her claim that Hardesty put a gun in her face during the incident, the Court is not persuaded. Further, the Court concludes that Bussa's recitation of the facts surrounding this allegation is out of context and, when read in context, it does not appear that Hardesty's gun was ever drawn near Bussa. Although Hardesty initially moved toward the crashed Honda with his gun drawn, he was not within visible or even reachable distance of Bussa to have placed a gun

ORDER - 9

in her face. Indeed, at the time he initially approached the Honda with his gun drawn, he did not know of Bussa's presence. Moreover, he had to return to the Honda to release Cliff; no facts suggest that his gun was drawn on Bussa during the dog bite or subsequent release of Cliff. The only other time a gun was drawn, according to the facts, is when Lundborg was ordering Bussa out of the car at gunpoint.

Bussa's briefing on this issue consistently, but inappropriately, discounts the fact that Piccolo had, just prior to Bussa's detention, involved her in a dangerous, high-speed pursuit that ended in a car crash on a private citizen's property wherein the driver of the Honda fled immediately and Bussa's presence was unknown until after Cliff bit her leg. The Court agrees with Lundborg's characterization of the incident as a "high-risk" stop. Thus, even if the Court believed that the facts could support a claim that Hardesty put his gun in Busso's face, officer safety would permit Hardesty to have drawn his weapon until he was assured that Bussa was no longer a threat, given the volatile nature of the situation.

### d. Conclusion

Based on the foregoing, taking the facts in the light most favorable to Bussa, the Court concludes that Bussa cannot establish that she was seized within the meaning of the Fourth Amendment by Hardesty.[5] Therefore, the Court grants summary judgment in favor of the Moving Defendants on this issue.

### 2. Unlawful Arrest

Bussa argues that Lundborg wrongfully arrested her when he ordered her out of the Honda and placed her in handcuffs before being released to the medical unit. In opposition, the Moving Defendants argue that Bussa was the subject of a proper *Terry* stop.

---

[5]Bussa has not provided the Court with adequate authority for any different outcome. The cases provided by Bussa are either factually or legally distinct from this case.

When police have an "articulable suspicion that a person has committed or is about to commit a crime," police may conduct an investigatory stop without running afoul of the Fourth Amendment. *Florida v. Royer*, 460 U.S. 491, 498 (1983). This articulable suspicion standard "is a less demanding standard than probable cause," and requires only "a minimal level of objective justification." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). In determining whether the standard is met, the Court considers "the totality of the circumstances . . . to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id*. at 273 (internal quotations omitted).

Here, Bussa's presence at the high-risk stop became known after a high-speed chase came to an end and the driver fled on foot, which is a felony (attempting to elude a pursuing police vehicle). *See* RCW 46.61.024. Bussa's involvement in this incident may have, but did not, lead to accomplice liability under Washington law. RCW 9A.08.020(1), (2); *see also* RCW 9A.08.020 (scope of accomplice liability). Further still, in a similar case, the Ninth Circuit held that it was not an arrest or even unreasonable to order a passenger out of a vehicle at gun point after a high-speed pursuit. *Allen v. City of Los Angeles*, 66 F.3d 1052 (9th Cir. 1995) (officer relying on need for safety as objective rationale in light of experience being in similar high-risk situations). In *Allen*, the Court determined that the passenger – later released when determined not to be a threat or an accomplice – was subjected to a valid *Terry* stop and not an arrest when ordered out of the vehicle by gunpoint and then handcuffed during the detention. *Id*. at 1055, 1057 (holding that officers are entitled to employ reasonable methods to protect themselves).

Here, Hardesty was led on a high-speed chase, and he and Lundborg did not know the whereabouts of Piccolo after she fled. Hardesty and Lundborg did not know why

ORDER - 11

Piccolo sped away, forcing the chase. Hardesty also did not know of Bussa's existence and later the level of her involvement. Unlike the facts in *Allen*, risk associated with Bussa's case was increased because the driver of the vehicle fled the scene and Bussa was an unknown quantity until Cliff found her. When Lundborg ordered Bussa out of the vehicle, he didn't know whether she was armed or whether weapons were available within the vehicle. Bussa was also exhibiting uncooperative behavior and had to be repeatedly ordered out of the vehicle. Lundborg also did not know her level of involvement with Piccolo. In fact, it is undisputed that once Lundborg determined he and his fellow officers were safe, he released Bussa to medics, and she was then taken to the hospital without further police involvement at that point.

Bussa's arguments that she was innocent and posed no threat to the officers is undermined by the facts of the case. The officers did not know of her presence until Piccolo committed the crime of felony eluding by exiting the crashed Honda and fleeing the scene. Therefore, it is reasonable that Bussa became a suspect after the officers learned of her presence but before her involvement was deemed neutral and that she was no longer a threat to safety; once officer saftey was established, Bussa was released.

Looking at the totality of the circumstances, Lundborg had an articulable suspicion based on his training and experience that justified his legitimate *Terry* stop of Bussa.[6] He did not wrongfully arrest her.

Therefore, the Court grants summary judgment in favor of the Moving Defendants on this issue.

---

[6]Although Lundborg testified in his deposition that he had "arrested" Bussa, this subjective use of the word "arrest" does not necessarily mean that Bussa was arrested on an "objective" basis. Instead, the facts establish that Bussa was subject to a *Terry* stop wherein it was reasonable under the totality of the circumstances for Lundborg to detain her using handcuffs.

ORDER - 12

**3.     Excessive Force**

Bussa claims that Hardesty and Lundborg used excessive force against her during the incident in question.

Excessive force claims, for purposes of the Fourth Amendment, are analyzed under an objectively reasonable standard. *Graham v. Connor*, 490 U.S. 386 (1989). A court uses the following analytical framework to determine reasonableness: (1) severity of the intrusion on the individual's Fourth Amendment rights by considering the amount and type of force inflicted; (2) governmental interests, given the severity of the crime, whether the suspect posed immediate threat to officer/public safety, and whether the suspect resisted arrest or attempted to escape; and (3) balancing the gravity of the intrusion on the individual against the government's need for such intrusion. *Espinosa v. City and County of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010). In making its assessment the Court must consider the totality of the circumstances of the particular case. *Fikes v. Cleghorn*, 47 F.3d 1011, 1014 (9th Cir. 1995).

A court considers the amount of force used during the moment of force from the perspective of a reasonable officer, not hindsight. *Graham*, 490 U.S. at 396. This "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation. *Id*. at 396-97. In short, the question is whether the officer acted in an objectively reasonable manner in light of the facts and circumstances in front of him. *Id*. at 397.

**a.     Hardesty**

To succeed on an excessive force claim, a plaintiff must first establish that a seizure occurred within the meaning of the Fourth Amendment. *Adams v. City of Auburn Hills*, 336 F.3d 515, 518-19 (9th Cir. 2003).

Because Hardesty did not seize Bussa within the meaning of the Fourth Amendment, see above, her claim of excessive force against Hardesty fails.

### b. Lundborg

It is undisputed that Lundborg seized Bussa within the meaning of the Fourth Amendment. However, the Fourth Amendment only protects against *unlawful* seizure. U.S. Const. amend IV. The question here is whether, given the totality of the circumstances, Lundborg's use of force to detain Bussa was excessive.

The Court need not repeat all the facts discussed above in concluding that Lundborg's actions were not excessive in light of the high-risk stop. He acted reasonably in light of the totality of the circumstances to ensure officer safety of himself and his fellow officer.

Therefore, taking all the facts in the light most favorable to Bussa, the Court cannot conclude that, based on the law, Bussa could prevail in her argument that Lundborg used excessive force in detaining her.

### c. Conclusion

Based on the foregoing, the Court grants summary judgment on the excessive force issue in favor of the Moving Defendants.

### 4. Qualified Immunity

In determining whether qualified immunity will be granted in cases such as these, the Court first takes the facts in the light most favorable to the plaintiff to determine whether constitutional violation occurred. *Kennedy v. City of Ridgefield*, 411 F.3d 1134, 1141 (9th Cir. 2005). If so, then the Court must determine whether the underlying law was "clearly established" at the time of the violation. *Id*. However, where a constitutional violation is not shown to have been committed, qualified immunity is present for governmental actors, such as police officers. *See id*; *see also Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2002).

Because Bussa fails to establish any constitutional violation, as discussed above, Lundborg and Hardesty are immune from suit under qualified immunity in this case.

Even if Bussa could somehow establish a constitutional violation, Hardesty and Lundborg would be entitled to qualified immunity. *See, e.g., Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (qualified immunity turns on "objective legal reasonableness of the action assessed in light of the legal rules that were clearly estalished at the time it was taken"); *Floyd v. Laws*, 929 F.2d 1390, 1393 (9th Cir. 1991) ("fact-specific inquiry" to determine whether analogous conduct was previously found unconstitutional); *see also Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991) (concluding summary judgment is appropriate when based on qualified immunity where officer was not on notice that his conduct would be clearly unlawful).

Here Bussa has failed to provide any adequate authority to suggest either Hardesty's or Lundborg's actions were not entitled to qualified immunity. Indeed, the Court's review of the relevant cases supports the opposite conclusion, as discussed above.

Therefore, under the facts viewed in the light most favorable to Bussa, summary judgment is granted in favor of the Moving Defendants on this issue.

### 5. Municipal Liability

Bussa concedes that she cannot succeed in her municipal liability claims; therefore, the Court dismisses her municipal liability claims and grants summary judgment on this issue in favor of the Moving Defendants. *See* Dkt. 16 at 33 (conceding failure to establish this issue).

### 6. Supplemental Jurisdiction

A district court "may decline to exercise supplemental jurisdiction over a [state law] claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ." 28 U.S.C. 1367.

Based on the foregoing grant of summary judgment in favor of the Moving Defendants, the following claims remain: (1) Pierce County's alleged liability under the Washington's dog bite statute, RCW 16.08.050; and (2) Bussa's claims against Piccolo, a private citizen, for "injuries sustained in the car crash." *See* Amended Complaint ¶¶ 3.1, 3.3. These are state law claims.

The Court declines to exercise supplemental jurisdiction over these claims and remands the case to state court on the state law issues. *See* 28 U.S.C. 1367.

### IV. ORDER

Therefore, it is hereby **ORDERED** that the Moving Defendants' motion for summary judgment is **GRANTED in part** and the remaining state law claims are **REMANDED** as discussed herein.. This matter is closed.

DATED this 4th day of January, 2011.

*[signature]*

BENJAMIN H. SETTLE
United States District Judge